1   Michael K. Dana (State Bar No. 019047)
    Teresa K. Anderson (State Bar No. 024919)
2   SNELL & WILMER L.L.P.
    One Arizona Center
3   400 E. Van Buren
    Phoenix, AZ  85004-2202
4   Telephone: (602) 382-6000
    Attorneys for Defendants Robert Russo, QED Media Group,
5   L.L.C., and Internet Defamation League L.L.C.

6                IN THE UNITED STATES DISTRICT COURT

7                   FOR THE DISTRICT OF ARIZONA

8
    XCENTRIC VENTURES, LLC, an Arizona
9   corporation, d/b/a                        Case No. CV07-00954 PHX NVW
    "RIPOFFREPORT.COM"; ED
10  MAGEDSON, an individual,                  **THE QED DEFENDANTS'
                                              MOTION TO DISQUALIFY
11                 Plaintiff,                 PLAINTIFFS' COUNSEL**

12  v.

13  WILLIAM "BILL" STANLEY, an
    individual; WILLIAM "BILL" STANLEY
14  d/b/a DEFAMATION ACTION.COM;
    WILLIAM "BILL" STANLEY d/b/a
15  COMPLAINTREMOVER.COM;
    WILLIAM "BILL" STANLEY aka JIM
16  RICKSON; WILLIAM "BILL" STANLEY
    aka MATT JOHNSON; ROBERT RUSSO,
17  an individual; ROBERT RUSSO d/b/a
    COMPLAINTREMOVER.COM;
18  ROBERT RUSSO d/b/a
    DEFENDMYNAME.COM; ROBERT
19  RUSSO d/b/a QED MEDIA GROUP,
    L.L.C.; QED MEDIA GROUP, L.L.C.;
20  QED MEDIA GROUP, L.L.C. d/b/a
    DEFENDMYNAME.COM; QED MEDIA
21  GROUP, L.L.C. d/b/a
    COMPLAINTREMOVER.COM;
22  DEFAMATION ACTION LEAGUE, an
    unincorporated association; and
23  INTERNET DEFAMATION LEAGUE, an
    unincorporated association,
24
                   Defendants.
25

26

27

28

2010852.1

Dockets.Justia.com

| | |
|---|---|
| 1 | ROBERT RUSSO, an individual; and QED MEDIA GROUP, L.L.C., |
| 2 | |
| | Counterclaimants, |
| 3 | |
| | v. |
| 4 | |
| | XCENTRIC VENTURES, LLC, an Arizona |
| 5 | corporation, d/b/a "RIPOFFREPORT.COM"; ED |
| 6 | MAGEDSON, an individual, |
| 7 | Counterdefendants. |

8

9       Defendants QED Media Group LLC ("QED Media Group"), Internet

10 Defamation League, LLC ("IDL"), and Robert Russo ("Russo") (collectively, the "QED

11 Defendants") move to disqualify Plaintiffs' counsel, Maria Crimi Speth and her law

12 firm, Jaburg & Wilk, P.C." (collectively, "Jaburg & Wilk") from representing Plaintiffs

13 in this action. Jaburg & Wilk's representation of Plaintiffs in this action violates several

14 Rules of Professional Conduct. Specifically, Jaburg & Wilk and its attorneys have direct

15 personal, economic, and reputational interests in the outcome of this case that create a

16 violation of ER 1.8(i) and 1.7(a)(2). Moreover, because Plaintiffs' lead attorney, Ms.

17 Speth is a necessary fact witness, her participation as counsel violates E.R. 3.7. This

18 Motion is supported by the accompanying Memorandum of Points and Authorities.

19               **MEMORANDUM OF POINTS AND AUTHORITIES**

20     **1.**    **FACTUAL BACKGROUND**

21       Plaintiffs' Complaint alleges that Defendants created several websites and posted

22 defamatory information on those websites about Plaintiffs' counsel, Jaburg & Wilk.

23 (*See* Complaint at ¶¶ 58-59.) Plaintiffs also allege that the information posted on these

24 websites infringes Jaburg & Wilk's copyrights. (*See id.*)

25

26 / / /

27 / / /

28 / / /

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    At the preliminary injunction hearing, Plaintiffs offered evidence that focused in

2    large part on the websites concerning Jaburg & Wilk and a purported connection[1]

3    between those websites and the QED Defendants.  The Court specifically highlighted

4    evidence about the content of those websites in its ruling.  (Transcript of May 27, 2007

5    Preliminary Injunction Hearing ("Hearing Transcript"), Ex. 1, at 90:3-11.)  Nearly all of

6    the mandatory relief sought by Plaintiffs in their proposed Preliminary Injunction is the

7    removal of those websites containing content about Jaburg & Wilk as well as other

8    information about Jaburg & Wilk's attorneys on numerous other websites.  (*See*

9    Plaintiffs' proposed Preliminary Injunction at 12-13, attached as Exhibit A to Plaintiffs'

10   5/23/2007 Notice of Lodging Preliminary Injunction.)

11   At the preliminary injunction hearing, Plaintiffs introduced their own counsel,

12   Ms. Speth, to testify regarding the purported "relationship" between the QED

13   Defendants and the other defendants in this lawsuit.  (Hearing Transcript, Ex. 1, at 55:1-

14   69:3.)  Ms. Speth spoke extensively about several communications she purportedly had

15   with Defendants and about her own research into the purported relationship between the

16   QED Defendants, the subject websites and internet postings, and the other defendants in

17   the case.  (*See id.*)  Ms. Speth testified that she was "99 percent certain" that Defendant

18   Stanley and Defendant Russo posted negative messages about Ms. Speth and Jaburg &

19   Wilk on numerous websites.  (*Id.* at 65:24-66:9.)  She concluded her direct examination

20   by expressing her own personal belief that she has "every reason to believe that Mr.

21   Russo and Mr. Stanley are affiliated with one another."  (*Id.* at 68:24-69:2.)

22   On redirect, Ms. Speth testified that she had "no doubt" about the existence of an alleged

23   wrongful relationship between Mr. Russo and Mr. Stanley.  (*Id.* at 79:3-7.)

24   On June 14, 2007, Plaintiffs filed a Motion for Decision on Preliminary

25   Injunction Against Defendants.  (6/14/2007 Motion for Decision on Preliminary

26

27   [1] As demonstrated by the QED Defendants' May 23, 2007 Response to Plaintiffs' Notice
     of Lodging Preliminary Injunction, and the accompanying Declaration of Robert Russo,

28   the QED Defendants have nothing to do with the subject websites about Jaburg & Wilk
     and its attorneys.

2010852.1

Injunction Against Defendants.) Plaintiffs' stated purpose for filing this Motion is that "Plaintiffs are suffering a great hardship every day that goes by without entry of the Preliminary Injunction." (*Id.* at 3.) That Motion, however, does not focus on any "hardship" of Plaintiffs. Rather, Plaintiffs' Motion, and the additional documentation submitted by Plaintiffs in support of that Motion, focuses entirely on the Jaburg & Wilk content on various websites and the ability to access those websites through internet searches of Jaburg & Wilk's attorneys. (*Id.* at Exhibits A & B.)

### 2. JABURG & WILK'S REPRESENTATION OF PLAINTIFFS IN THIS ACTION VIOLATES ER 1.7(a)(2) & ER 1.8(i).

The Arizona Rules of Professional Conduct expressly prohibit a lawyer from acquiring "a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client." Ariz. R. Sup. Ct. 42, ER 1.8(i). This rule is designed to "avoid giving the lawyer too great an interest in the representation." *Id.* at cmt. 16. The Rule addresses the concern that "the lawyer will not seek and accept client guidance on major decisions in the lawsuit because of the lawyer's own economic interest in the outcome." *Ankerman v. Mancuso*, 860 A.2d 244, 247-48 (Conn. 2004.)

By accepting representation of Plaintiffs in this case, Jaburg & Wilk acquired a direct unavoidable proprietary interest in the subject matter and outcome of this case. The personal economic interests of Jaburg & Wilk and its attorneys are inextricably connected to Plaintiffs' interests by virtue of the various websites and internet postings at the core of Plaintiffs' claims. Those websites allege, *inter alia*, that Plaintiffs, Ms. Speth, and her law firm Jaburg & Wilk are "partners" in a "ripoff report extortion scam."

At the preliminary injunction hearing, Ms. Speth testified extensively about the content of those websites. (Hearing Transcript, Ex. 1, at 66:20-67:23.) She asserted that those websites contained copyrighted information without authorization from Jaburg & Wilk, and she contested allegations on the websites that she has a partnership relationship with Plaintiffs – a relationship the websites allege is for the purpose of extortion. (*See id.*) In addition, Plaintiffs specifically allege in their Complaint that

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

these websites defame Jaburg & Wilk and violate Jaburg & Wilk's copyrights. (Complaint at 58-59.) Clearly, Ms. Speth, Jaburg & Wilk, and the firm's other attorneys have personal proprietary interests in protecting their own reputations and copyrights.

Plaintiffs' recent Motion for Decision on Preliminary Injunction Against Defendants exemplifies Jaburg & Wilk's own concern for its personal proprietary interest in this litigation. Rather than highlighting ways in which Plaintiffs might allegedly be harmed by the lack of an injunction, Plaintiffs' Motion focuses entirely on the publication of content about Ms. Speth, Jaburg & Wilk and its other attorneys. (Motion for Decision on Preliminary Injunction Against Defendants at Exhibits A & B.)

Jaburg & Wilk's representation of Plaintiffs also more generally violates ER 1.7(a)(2). That Rule prohibits "a lawyer from representing a client if the representation involves a concurrent conflict of interest." Ariz. R. Sup. Ct. 42, ER 1.7(a). A concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer." *Id.* at 1.7(a)(2). This conflict may be waived only if "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation" to the client. *Id.* at 1.7(b)(1).

The actions and allegations by Plaintiffs and their counsel at the early stages of this case have already demonstrated the significant risk that Ms. Speth's own personal interests and those of her firm will materially limit Jaburg & Wilk's ability to represent Plaintiffs. Jaburg & Wilk is not simply playing the role of "advocate" for its clients' interests. It is clear from the preliminary injunction hearing, Plaintiffs' recent allegations, and the recent documentation submitted by Plaintiffs, that the personal interests of Ms. Speth, Jaburg & Wilk, and the firm's other attorneys are intertwined with Plaintiffs' own interests.

But while intertwined, those interests certainly are not identical. Plaintiffs have their own personal, financial, and reputational interests in this lawsuit that differ from those of Ms. Speth, Jaburg & Wilk, and its other attorneys. The risks created by these

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   conflicts are obvious. Jaburg & Wilk would be routinely faced with decisions that may
2   favor the interests of Jaburg & Wilk over those of Plaintiffs, and vice versa. A
3   Defendant may offer a settlement that benefits Plaintiffs but not Jaburg & Wilk. Jaburg
4   & Wilk may be faced with competing discovery strategies, some of which are more
5   beneficial to Plaintiffs' interests, and some of which are more beneficial to Jaburg &
6   Wilk's interests. And of course, who bears the financial burden of litigation and the
7   financial risk of a loss? Ms. Speth testified during the hearing that she works on an
8   hourly basis. (Hearing Transcript at 67:9-10.) What if a judgment is entered against
9   Plaintiffs for Defendants' attorneys' fees and costs? Even though Jaburg & Wilk would
10  benefit from a victory, Plaintiffs would be solely responsible for an award of fees and
11  costs in the event of a loss.

12          The Rules of Professional Responsibility do not permit Jaburg & Wilk to use this
13  lawsuit as a vehicle for pursuing its own interests while Jaburg & Wilk's clients bear the
14  financial burden of litigation and the financial risk of a loss. Because of Jaburg &
15  Wilk's direct proprietary interest in the outcome of this case, its representation of
16  Plaintiffs violates ER 1.8(i) and cannot be waived. Moreover, because no "reasonable"
17  lawyer could believe that "competent and diligent representation" could be provided
18  under the circumstances, the representation also more generally violates ER 1.7(b). *See*
19  ER 1.7(b)(1).

20  **3.      JABURG & WILK'S PARTICIPATION AS COUNSEL IN THIS ACTION VIOLATES
21          ER 3.7.**

22          The corollary to the intertwined interests of Plaintiffs and Jaburg & Wilk is that
23  Ms. Speth, likely driven by the additional motivation of her own personal interests and
24  those of her law firm, has injected herself into the factual underpinnings of this litigation,
25  thereby becoming a necessary witness. The Rules of Professional Conduct prohibit a
26  lawyer from acting as an advocate at trial in which the lawyer is likely to be a necessary
27  witness unless (1) the testimony relates to an uncontested issue; (2) the testimony relates
28  to the nature and value of legal services rendered in the case; or (3) disqualification of

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

2010852.1

1  the lawyer would work a substantial hardship on the client. Ariz. R. Sup. Ct. 42, ER 3.7.

2  [2] Where the evidence expected from a lawyer is "material, necessary for the just

3  determination of the issues, and unavailable from other sources, the court may order

4  [such] attorney's disqualification." *Cottonwood Estates, Inc. v. Paradise Builders, Inc.*,

5  128 Ariz. 99, 105, 624 P.2d 296, 302 (1981).

6      The Arizona Supreme Court has warned of the risks of permitting a potential trial

7  witness to serve as an advocate:

8      The attorney who testifies diminishes his effectiveness as advocate as well
       as his effectiveness as a witness . . . . Like any witness, the attorney is
9      subject to cross-examination on any relevant matter, Ariz. R. Evid. 611,
       including the professional and financial interest in the outcome of the
10     litigation, . . and impeachment by the usual methods of demonstrating bias
       or prejudice . . . . The advocate who testifies places himself in the position
11     of being able to argue his own credibility. This special witness can take
       the stand, objectively state the facts from personal knowledge, then press
12     home those facts by argument to the jury. Our belief is that an adversary
       system works best when the roles of the judge, of the attorneys, and of the
13     witnesses are clearly defined. Any mixing of those roles inevitably
       diminishes the effectiveness of the entire system.
14

15  *Sellers v. Superior Court*, 14 Ariz. 281, 288, 742 P.2d 292, 299 (App. 1987) (quoting

16  *Cottonwood Estates, Inc.*, 128 Ariz. at 102-03, 624 P.2d at 299-300 (citations omitted));

17  *see also* ER 3.7, cmts. 2-4 (indicating that a party can easily be prejudiced when

18  opposing counsel acts as both an advocate and a witness).

19      **3.1    MS. SPETH IS A NECESSARY TRIAL WITNESS IN THIS CASE.**

20      Ms. Speth's testimony constituted a substantial portion of the evidence offered by

21  Plaintiffs in support of their preliminary injunction application. One of Plaintiffs' main

22  purposes for offering Ms. Speth's testimony was to prove a relationship between the

23  QED Defendants, the other defendants, and the subject websites that would be legally

24  sufficient to impute wrongful conduct to the QED Defendants. (*See* Hearing Transcript,

25  ―――――――――――
   [2] At the preliminary injunction hearing, Counsel for the QED Defendants did not object
26  to the Court granting Ms. Speth leave to examine Mr. Russo, if he had been called to
   testify telephonically at the hearing (Mr. Russo was not called, and Ms. Speth ultimately
27  did not participate as an advocate). Counsel's agreement was for purposes of the
   preliminary injunction hearing only and was made before the QED Defendants and their
28  counsel fully understood the significance of Ms. Speth's participation as a fact witness
   and the relationship between Plaintiffs' and Jaburg & Wilk's interests in this case.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

2010852.1

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   Ex. 1, at 55:1-69:3.)  Such a relationship is critical to Plaintiffs' claims against the QED

2   Defendants.  Without such a relationship, Plaintiffs' claims fail as a matter of law.

3       Ms. Speth testified about her own communications with Defendant Russo and

4   Defendant Stanley.  Ms. Speth is the **only** witness competent to testify for Plaintiffs

5   about these communications.  Ms. Speth also testified about her own personal research

6   into the origins of the various websites at the center of this case and her allegation that

7   many of the websites trace back to QED Media Group.

8       Ms. Speth strongly vouched for her clients, expressing her own personal belief

9   that the QED Defendants participated in wrongful conduct against Plaintiffs.  She

10  asserted that she is "99 percent certain" that Mr. Russo posted defamatory content about

11  Jaburg & Wilk.  (*Id.* at 65:24-66:9.)  Ms. Speth also asserted that she has "every reason

12  to believe that Mr. Russo and Mr. Stanley are affiliated with one another."  (*Id.* at 68:24-

13  69:2.)  And she claimed to have "no doubt" about a purported wrongful relationship

14  between Mr. Russo and Mr. Stanley.  (*Id.* at 79:3-7.)  It is critical that the QED

15  Defendants be permitted to take discovery relevant to Ms. Speth's allegations, take Ms.

16  Speth's deposition, cross-examine her at trial, and if necessary, call her as a witness in

17  the QED Defendants' case-in-chief to explore and discredit her personal knowledge and

18  beliefs relevant to these material issues.

19      Ms. Speth also contested the truthfulness of the content on the subject websites.

20  (*Id.* at 67:5-23.)  Although the QED Defendants are not responsible for any of that

21  content, any other defendants who may be responsible would have the right to examine

22  Ms. Speth regarding the truthfulness of those allegations because "truth" is a defense to

23  Plaintiffs' defamation claim.

24      **3.2   MS. SPETH'S PARTICIPATION AS COUNSEL IN THIS CASE IS NOT
         PERMITTED BY ANY EXCEPTIONS TO THE GENERAL RULE.**

25

26      None of the exceptions provided by ER 3.7 permit Ms. Speth or Jaburg & Wilk to

27  participate as counsel in this case.  First, whether the QED Defendants have participated

28  with other defendants to commit any wrongful conduct is certainly not an "uncontested

2010852.1

issue" – it is the **primary contested issue** in this case as it relates to the QED

Defendants. Second, none of Ms. Speth's testimony "relates to the nature and value of

legal services rendered in the case." Third, disqualification of Jaburg & Wilk would not

"work a substantial hardship" on Plaintiffs. The QED Defendants are filing this motion

at the early stages of this litigation, permitting ample time for Plaintiffs to retain new

counsel. The QED Defendants are certainly willing to accommodate any extensions

necessitated by Plaintiffs' search for counsel. Finally, no other attorney at Jaburg &

Wilk would be permitted to represent Plaintiffs because of the unwaivable conflicts

discussed in Section 2 above. *See* Ariz. R. Sup. Ct. 42, ER 3.7(b) (a non-witness lawyer

from the same firm as the witness lawyer may act as an advocate only if the non-witness

lawyer is not precluded from doing so by ER 1.7 or 1.9); Ariz. R. Sup. Ct. 42, ER 1.8(k)

(prohibition based on proprietary interest in cause of action applies to all lawyers

associated at the same firm).

## 4. CONCLUSION

For the reasons set forth above, Jaburg & Wilk should be disqualified from

representing Plaintiffs in this litigation.

DATED this 20th day of June, 2007.

SNELL & WILMER L.L.P.


By    /s/ Michael K. Dana
     Michael K. Dana
     Teresa K. Anderson
     One Arizona Center
     400 E. Van Buren
     Phoenix, AZ 85004-2202
     Attorneys for Defendants Robert
     Russo, QED Media Group, L.L.C., and Internet
     Defamation League LLC

/ / /

/ / /

/ / /

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

# CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2007 I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing to the following CM/ECF participant:

> Maria Crimi Speth
> Jaburg & Wilk
> 3200 North Central Avenue
> Suite 2000
> Phoenix, Arizona 85012
> Attorneys for Plaintiffs
> mcs@jaburgwilk.com

I further certify that on June 20, 2007, I served a courtesy copy of the aforementioned document and transmittal of a Notice of Electronic Filing by mail on the following:

> The Honorable Neil V. Wake
> United States District Court
> 401 West Washington Street,
> Phoenix, Arizona 85003

/s/ E. E. Szafranski

2010852.1

**EXHIBIT 1**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

Xcentric Ventures, LLC., et
al.,
                            )
                            )
                            )  No.  **CV 07-0954-PHX-NVW**
            Plaintiffs,      )
vs.                         )
                            )      **Phoenix, Arizona**
William "Bill" Stanley, et  )      **May 17, 2007**
al.,                        )          **1:35 p.m.**
                            )
            Defendants.      )

---

BEFORE:  **THE HONORABLE NEIL V. WAKE**
         UNITED STATES DISTRICT JUDGE


(Preliminary Injunction/Show Cause Hearing)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1    not here.  But it will give me comfort if you all are able

2    to agree on the language of the injunction.

3         I edited the temporary restraining order

4    precisely for this reason, to try to make it more -- not

5    trespass into what is permissible speech or conduct.  I

6    note that the postings concerning the law firm are

7    defamatory per se.  They accuse Ms. Speth of unethical

8    conduct which touches and concerns her profession.  So

9    that's common law that's defamatory per se.  The

10   jaburgwilksucks.com is also defamatory per se because its

11   it imputes unchastity.  So we're looking at egregiously

12   defamatory and false postings here.  They are also

13   egregiously improper to the extent that they falsely

14   attribute that they are posting to persons other than they

15   are responsible for.  So I intend to issue an injunction

16   that clearly and strongly restrains that kind of conduct

17   and the other kinds of conduct I received testimony about.

18        And because of the flexibility with which people

19   who are willing to break the law can come at these things,

20   it's appropriate for this to be drafted broadly enough to

21   cover new variations of similar conduct so that I'm

22   comfortable with enjoining anything that's false, that

23   gives a false -- anything that is defamatory.  In light of

24   the strong showing of bad faith and malice that I have

25   received, I'm comfortable enjoining conduct that is

1   A.  I first spoke to Mr. Russo on the -- I believe it was

2   the 31st of January when we received the letter that was

3   addressed to Prolexic that said Overstock.com.  It was

4   signed by William Stanley of the Internet Defamation

5   League.  It -- I then got on the internet and I looked up

6   the Internet Defamation League, found out the WHOIS

7   information and found out who was behind it and called the

8   number.

9           Rob Russo answered the phone, and I asked for

10  William Stanley.  He said he was not William Stanley but

11  he knew how I could reach William Stanley, and he asked me

12  who I was.  I explained to him who I was, and we had a

13  conversation about the Prolexic letter and about the

14  threat to Prolexic that if they didn't stop doing business

15  with ripoffreport they would be inundated with phone

16  calls.

17  Q.  Did he identify what he knew about Mr. Stanley?

18  A.  Yes.  He told me that Mr. Stanley was a hired gun.

19  Q.  Hired gun?

20  A.  Hired gun.

21  Q.  Are those words his?

22  A.  Those were his words.  He told me that Mr. Stanley

23  does not play within the rules; that he's bad news; and

24  that I don't want to mess with him.

25  Q.  Did he tell you what he, Mr. Russo, wanted?

1    A.  He -- well, he didn't say he wanted anything.  He

2    said -- I told him that William Stanley had represented

3    himself to be acting on behalf of the Internet Defamation

4    League.  And Rob Russo said, that's my company, or my

5    organization.  And Bill Stanley and I are no longer

6    affiliated because Bill doesn't play within the rules.  He

7    did not have my permission, he told me, he did not have

8    Russo's permission to use the Internet Defamation League

9    words underneath that threatening e-mail.

10   Q.  Did you then speak to Mr. -- well, is there anything

11   else significant that happened in that conversation?

12   A.  Well, yes.  In that conversation he gave me Bill

13   Stanley's phone number.

14   Q.  Okay.  And by the way, what area code was Mr. Russo

15   when you called him?

16   A.  207 area code, which is Portland, Maine, which is the

17   same area code as Mr. Russo.  I'm sorry.  Did you ask me

18   about Mr. Stanley?

19   Q.  I was asking about Mr. Russo.

20   A.  I apologize.  Mr. Russo was 207 area code, Portland,

21   Maine.

22   Q.  So the Internet Defamation League, Mr. Russo's outfit,

23   had an area code 207 Portland, Maine, phone number?

24   A.  Correct.

25   Q.  And Mr. Russo then gave you Mr. Stanley's phone number

UNITED STATES DISTRICT COURT

1  that also had a 207?

2  A.  Correct.

3  Q.  Did you then call Mr. Stanley?

4  A.  I did.

5  Q.  Briefly relate that conversation.

6  A.  I asked Mr. Stanley if he was the person who contacted

7  Prolexic about ripoffreport.  His response was, "I contact

8  a lot of people about ripoffreport."

9         I asked him if he was affiliated the Internet

10  Defamation League.  He said he was not.  He said he was

11  affiliated with the Defamation Action League.  I asked him

12  why he signed the letter to Prolexic Internet Defamation

13  League and he said, "so I got it wrong" or something like

14  that, "I got it wrong.  I mixed them up."

15         He referred during that -- he told me that I

16  represent a -- very early on he told me that I represented

17  a scumbag.  He also told me that --

18         THE COURT:  Slow down a little bit, Ms. Speth.

19         THE WITNESS:  He referred several times during

20  that conversation to his members.  But once during the

21  conversation when he was really angry and he was yelling

22  at me, he said, "My client is going to, you know, put your

23  client out of business."

24         I asked him who his client was, and he says --

25  then he went back to saying I have many members.  He never

1    would tell me who his members were.

2          I asked him what he wanted.  I asked him what he

3    was trying to accomplish, and he said, "It's very simple.

4    If you make your client take down reports about my

5    members, we'll leave him alone.  But if they don't, we

6    won't."  I said, "You mean take down defamatory reports or

7    reports that you claim are defamatory?"  He said, "No.

8    Take down all reports about my members, whether they are

9    true or false, or we will not leave you alone."

10          I then gave him a hard time about that and said,

11   you know, you want true reports taken down?  You don't

12   even care if they are true, you want to hide information

13   as long as it's your member?  And he said yes.  I said:

14   "Well, Mr. Stanley, if you want to accomplish what you

15   want to accomplish how could we do that if we don't know

16   who your members are?  So if I wanted to comply with your

17   request, whose report would I take down?"  He said, "Oh,

18   you think you are smart," and he wouldn't tell me.

19          So basically he put me in a position where he was

20   telling us we had to take down reports or continue to get

21   harassed, but he wouldn't tell me whose reports to take

22   down.  The conversation then -- oh.  I told him I was

23   going to get a court order or an injunction against him.

24   And he said, "I live in Austria.  I am not subject to your

25   laws.  You can't stop me.  I will just do what I want."

1    And he said, "If you get an injunction against William

2    Stanley then William Stanley will no longer exist, and

3    Bill Jones will appear."

4         I asked him, I said, "Are you saying that William

5    Stanley is not your real name?"  And he said, "Maybe,

6    maybe not."  He tried to prove to me that he was really in

7    Austria by telling me to listen to the radio in the

8    background and there was somebody German speaking and he

9    said that was proof that he was really in Austria.  Of

10   course, I was calling a 207 phone number.

11   Q.  Did he have an accent?

12   A.  He did not have an accent.

13   Q.  Let's move forward to Exhibit 36.  I don't believe I

14   offered this in evidence through Mr. Smith, because you

15   are the one who pulled this.  Can you tell us what is

16   Exhibit 36?

17   A.  Yes.  It's a website called defendmyname.com.  It is,

18   according to the WHOIS information, registered to a Robert

19   Russo.  It claims to remove ripoffreports.  I --

20   Q.  What do you mean remove ripoffreports?

21   A.  That's what it says.

22        MR. DANA:  Objection.  It doesn't claim to simply

23   remove ripoffreports.  You are not stating the sentence in

24   it entirety.

25   BY MR. MARTON:

1   Q.   Why don't you read into the record under the paragraph

2   remove ripoffreports?

3   A.   That's the title.   The title is remove ripoffreport.

4   It says, "The immediate goal of our service is to stop

5   defamation by positioning links on the search engine and

6   by appeals to law to remove negative information.  We send

7   cease and desist letters and, if necessary, file legal

8   action against the perpetrators and internet service

9   providers contributing to the unjust defamation of our

10  members."

11  Q.   Now, you said you know that this website belongs to

12  Mr. Russo.  How do you know that?

13  A.   That's the WHOIS information.  When you look up a

14  website --

15  Q.   Go to the third page of Exhibit 36 and explain that,

16  please.

17  A.   Right.  The WHOIS search by Network Solutions

18  indicates that the registrant is QED Media, LLC, and the

19  administrative contact is Robert Russo.

20  Q.   And that's on the third page of Exhibit 6?

21  A.   Yes.  And, by the way, Mr. Russo told me this was his

22  website.

23  Q.   Okay.  And then go to the second page of Exhibit 36

24  where it's got -- no.  That's still from defendmyname,

25  isn't it?

1   A.   Yes.   If you go to the fifth or sixth page, it's

2   complaintremover.com.

3   Q.   That's what I was looking for.

4   A.   The complaintremover.com site is identical -- well,

5   today, as it exists on the internet in this exhibit, they

6   are identical content-wise.  When I first looked at these

7   websites they were also identical graphics-wise.  Since

8   then, Mr. Russo changed the graphics but the content is

9   still identical.

10  Q.   So you are telling me that when you first looked, you

11  found that complaintremover was identical in graphics and

12  content to defendmyname.com?

13  A.   Exactly.  They were identical, identical websites.

14  Q.   And who owns complaintremover.com?

15  A.   Well, according to the WHOIS information, it is a

16  woman in Texas whose name is Lea Schurz.  But Rob Russo

17  told me that Bill Stanley owns it, and I believe that

18  Stanley also said -- yeah.  I know why.  Yeah.  Rob Russo

19  definitely told me that Bill Stanley owns it, and the

20  website actually talks about defamationaction.com.  So

21  it's Stanley's site.

22  Q.   Counsel asked before if there's anything that ties any

23  of this wrongful conduct to his client.  And I want you to

24  look at Exhibit 37 and tell us what it is in the context

25  in which this was done.

1    A.   Okay.  Well, this is the WHOIS information for the

2    website known as jaburgwilksucks.com.  There is an

3    identical website called mariaspeth.com and

4    mariacrimispeth.com.  All of those websites are under

5    proxy servers and are owned by a company called Reputation

6    Management.

7    Q.   Before we get there, when were these websites posted?

8    What happened that caused these to be posted?

9    A.   Okay.  I had a conversation with Rob Russo on the 3rd

10   of May.  I told him that I was going to be filing a

11   lawsuit and I asked him where I would serve him.  The next

12   day I received an e-mail, and every attorney in my firm

13   received an e-mail that said you are the subject of

14   protest and it attached these three websites.

15   Q.   So you called Mr. Russo, and the next day, these

16   websites appear?

17   A.   That is correct.  And then later on that day, I

18   received another e-mail that I guess we can talk about

19   later.  But with respect to these websites, if you look at

20   the WHOIS, the first page of the WHOIS information, under

21   name server, you would normally see an IP address there.

22   Instead of there being an IP address it says

23   NS1.xtrasupply.com.

24          I cut and pasted that address into my URL, and a

25   couple of pages down you can see what I got.  If I look in

1    the upper right hand corner, on the page that starts with

2    videowebsites.com, in the upper right-hand corner is the

3    URL, and it's still Exhibit 37.  It's the last two pages

4    of Exhibit 37.  It says http://ns1.xtrasupply.com.  So

5    this is what comes up with when you put that URL, when you

6    put that IP address into the URL.  It's called

7    videowebsites.  And if you look at the second page, it's

8    copyright QED Media, which is Rob Russo's company.

9         So Rob Russo's company is what you get when you

10   trace back the jaburgwilksucks website and mariaspeth.com

11   and mariacrimispeth.com, all of which Rob Russo claims

12   Bill Stanley did.  And, in fact, the websites themselves

13   claim they are from Bill Stanley.

14   Q.  Let's talk about the e-mail Exhibit 39, please.  Can

15   you tell me who this is from?

16   A.  Yes.  It says it's from Jim Rickson.  But Jim Rickson

17   is an alias Bill Stanley uses.  The reason I know that is,

18   number one, the e-mail address matches his e-mail address;

19   and number two, he actually signed an e-mail once to one

20   of the hosts as Bill Stanley, but the e-mail came from Jim

21   Rickson.

22   Q.  And then this e-mail is sent to who?

23   A.  Everyone in my firm.

24   Q.  All the lawyers in your firm?

25   A.  In addition to all the lawyers in our firm, also our

1    administrator, also our media company that does all of our

2    public relations.  And there's two e-mails.

3    Q.  What about the second e-mail?

4    A.  Well, the first e-mail just says you are being

5    protested and here's the website.  I did not respond in

6    any way to that e-mail.

7          Later that night at 11:30 at night, 11:25, I got

8    a second e-mail.  This one was from the same e-mail

9    address but this one supposedly from Matt Johnson.  And it

10   says, "Here's the deal."

11         THE COURT:  Which exhibit is this?

12         THE WITNESS:  This is also in 39.  This is the

13   second page of 39.  It's a 192-page e-mail.  The first

14   page of it -- and also, again, went to everyone in my

15   firm, the firm administrator, and the media company.

16         And it says, "Here's the deal.  We were not doing

17   crap to your beloved ripoffreport for the last couple of

18   months.  You took that as a weakness and fired a shot

19   across our bow."  He said, "We will sink your battleship."

20         And he says bottom line is that everyone on this

21   list below is going to receive an e-mail about you and is

22   going to -- you are going to be the laughing stock.  We

23   are going to shut you down.  We're going to shut your

24   client down.

25   Q.  Did you look through the list and see who the people

1    on those 292 pages are?

2    A.  I sure did.  I estimated 14,000 e-mail addresses.  And

3    there are at least, so far, that I have identified, five

4    of my clients on those e-mail addresses.  And I do not

5    know how he got our client list.

6    Q.  Very firm one, lawfirmalliance.org.  Who is that?

7    A.  Law Firm Alliance is an alliance of law firms across

8    the country and in Canada, and I think a couple of other

9    countries that Jaburg & Wilk is a member of.  We do

10   referrals back and forth to one another.

11   Q.  Last area, can you tell us about Exhibit 40, please?

12   A.  Yes.  After the injunction was entered in this case,

13   the temporary restraining order, excuse me, I e-mailed

14   that temporary restraining order to Mr. Stanley and Mr.

15   Russo.  That same day someone started posting on every

16   free blog that is out available on the internet, and I

17   have counted 40 so far, so on all kinds of websites where

18   you can post for free, the same content that is in the

19   exhibit that we didn't go through yet about our law firm

20   is posted on those other websites.

21        Here's the difference:  Their website, the

22   jaburgwilksucks.com website has no search engine

23   optimization.  It's very hard to find.  If you do a Google

24   search on it you won't find it.  I'm going to say Mr.

25   Stanley, because I'm 99 percent sure it was Mr. Stanley,

1    what Mr. Stanley did and Mr. Russo as well, who was right

2    there beside him, the day that I called him, he -- they

3    posted these on websites that have good standing on Google

4    and have good standing on MSN so that if you now do a

5    Google search on my name or law firm's name, in the top

6    results of Google in the first couple of pages of google

7    you get things like Green Peace, blog spirit, blog city,

8    and then it says things like Maria Speth, unethical

9    attorney; Maria Speth, extortionist.

10            And in many cases, whoever posted them pretended

11   to be me.  So it looks like -- well, if you look at it you

12   know it's not me.  But the idea is that I supposedly

13   posted my member profile on, for instance, green peace.

14   Say I'm a member of green peace.  Here's my member

15   profile.  And it's the same content as the jaburgwilksucks

16   website.  It says I'm an extortionist, says I'm an

17   unethical attorney.  Like I said, I found approximately 40

18   of these so far.  And he did all of this after the TRO was

19   entered.

20   Q.  Exhibit 38, I should have covered, is what's at the

21   Jaburgsucks website.  Did you give permission or, to your

22   knowledge, did anybody at Jaburg Wilk give permission to

23   use photographs that are posted there for which copyright

24   rights are reserved?

25   A.  Absolutely not.  This has the photograph of all of the

1    attorneys in the firm who are on the website.  These are

2    all copyright protected photographs.  No permission or

3    authorization was given and he copied them all onto the

4    website.

5          The website also says that I'm really a partner

6    in ripoffreport as opposed to just its lawyer.  That is

7    absolutely false.  I own no equity interest, no ownership

8    interest, get no revenue sharing.  I don't even have a

9    case on a contingency with ripoffreport.  I simply work on

10    an hourly basis.

11          He says that I direct its everyday business.

12    That is false.  I have no involvement in the day to day

13    business of ripoffreport.  He says that I write checks for

14    them.  That's incorrect.  Obviously, the law firm probably

15    laid out costs on a case, but that would be about it.

16          He says that we use ripoffreport business as a

17    referral site.  I have never once, in eight years, got any

18    piece of business off the ripoffreport website.  It has

19    never referred me any business.  Mr. Magedson has

20    separately referred me a client or two in the internet

21    world, but they weren't people who posted on the

22    ripoffreport.  So I have never gotten any business off of

23    it.

24          And it -- the website also posts the complaint in

25    this case, the TRO in this complaint, in this case.

1  Q.  Which website?

2  A.  The jaburgwilksucks website.  It posts both the order

3  that I originally requested and the narrower order that is

4  executed, and it infers that the reason that the order was

5  more narrow than what I requested was because the judge

6  did his homework and his research on me and determined

7  that a more narrow order was in order as a result of that.

8      It even says, "It's not like the defamation

9  action is the only one who knows Ed Magedson and Speth are

10  extorting folks."

11      He denies making death threats to Ed Magedson.  I

12  would point out that the letters that make the death

13  threats that say the death threat was sent on the 13th of

14  February.  It was dropped at Mr. Magedson's house and it

15  says we are going to send e-mails and protest your

16  advertisers.  And seven days later, Stanley and Russo

17  protested the advertisers.  So even though they claimed

18  they didn't write those letters, the things they said in

19  those letters actually came true.

20      The last thing he says is that I only named Rob

21  Russo in this case to get to him.  That's not correct.  I

22  had good faith --

23  Q.  I don't want to talk about your strategy.

24  A.  No.  I'm saying I have every reason to believe that

25  Mr. Russo and Mr. Stanley are affiliated with one another

1   and there's numerous things that we have introduced in

2   this case.

3   Q.  Okay.

4           MR. MARTON:  Well, that's all, Your Honor.  No

5   further questions.

6           THE COURT:  Mr. Dana, you may cross-examine.

7           MR. MARTON:  I forgot to offer the last exhibits

8   which, to be specific, were 35, 36, 37, 38, 39, and 40,

9   Your Honor.  I move for the admission of those.

10          THE COURT:  Any objection, Mr. Dana?

11          MR. DANA:  No objection, Your Honor.

12          THE COURT:  Exhibits 35 through 40 are admitted.

13  Now you may cross-examine.

14                       CROSS-EXAMINATION

15  BY MR. DANA:

16  Q.  Hello, Ms. Speth.

17  A.  Hello.

18  Q.  How many times have you spoken with Mr. Stanley on the

19  phone?

20  A.  Twice.

21  Q.  And when were those?

22  A.  Back in January.  You know what?  The second one was

23  just a voice mail.  So once.  I have one conversation and

24  one voice mail.

25  Q.  This is a voice mail that you left?

1  Mr. Stanley.  If it's just an alterego it probably won't.

2  But if they are an independent company, I believe it will.

3  Q.  One last area.  Throughout your testimony you told us

4  about the relationship between Mr. Russo and Mr. Stanley.

5  After being cross-examined, do you have any doubt about

6  the relationship you have told us about?

7  A.  I have no doubt.

8          MR. MARTON:  That's all I have, Your Honor.

9          THE COURT:  Ms. Speth, you may step down.

10          MR. DANA:  Your Honor, may I ask one further

11  question?

12          THE COURT:  You may.

13                  RECROSS-EXAMINATION

14  BY MR. DANA:

15  Q.  Ms. Speth, are you aware that Mr. Magedson has sent

16  e-mails to various members of the media where he has

17  referred to Mr. Russo as being an aka of Mr. Stanley?

18          THE WITNESS:  I refuse to answer, Your Honor.

19          MR. MARTON:  Objection; relevance.

20          THE WITNESS:  Attorney/client privilege.

21          THE COURT:  Overruled.

22          MR. DANA:  It's relevant because if that has

23  actually happened, that's further evidence that Mr.

24  Stanley may be doing things representing himself to be Mr.

25  Russo or do things on behalf of Mr. Russo when it's not