**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| XCENTRIC VENTURES, LLC, an Arizona Corporation, d/b/a "RIPOFFREPORT.COM"; ED MAGEDSON, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>WILLIAM "BILL" STANLEY, an individual; WILL "BILL" STANLEY d/b/a DEFAMATION ACTION.COM; WILL "BILL" STANLEY d/b/a COMPLAINTREMOVER.COM; WILLIAM "BILL" STANLEY aka JIM RICKSON; WILLIAM "BILL" STANLEY aka MATT JOHNSON; ROBERT RUSSO, an individual; ROBERT RUSSO d/b/a COMPLAINTREMOVER.COM; ROBERT RUSSO d/b/a DEFENDMYNAME.COM; ROBERT RUSSO d/b/a QED MEDIA GROUP, L.L.C.; QED MEDIA GROUP, L.L.C. d/b/a DEFENDMYNAME.COM; QED MEDIA GROUP, L.L.C. d/b/a COMPLAINTREMOVER.COM; DEFAMATION ACTION LEAGUE, an unincorporated association; and INTERNET DEFAMATION LEAGUE, an unincorporated association,<br><br>Defendants. | No. CV-07-0954-PHX-NVW<br><br>**FINDINGS OF FACT & CONCLUSIONS OF LAW** |

Pending before the court are Plaintiffs' Application for Preliminary Injunction (Doc. # 2). The court issues the following findings of fact and conclusions of law in support of a preliminary injunction.

**I.     Findings of Fact**

(1)    Plaintiff Ed Magedson is an Arizona resident and the manager of Plaintiff Xcentric Ventures, LLC, a company that operates a website known as "Ripoff Report" at www.ripoffreport.com. The site allows visitors to post and review complaints about companies and individuals that allegedly engage in wrongful business practices. Because the complaints are searchable in various search engines, they can draw significant negative attention to targeted businesses. Among the estimated millions of daily visitors to the website are law enforcement agencies that use the Ripoff Report to gather information about patterns of wrongful business activity.

(2)    Defendant William Stanley does business as Defamationaction.com and Complaintremover.com and is a member of the Defamation Action League, an unincorporated association. His place of residency is unknown and he uses the aliases Jim Rickson and Matt Johnson. Stanley has been placed on the Register of Known Spam Operations ("ROKSO") as a professional spam operator who has been terminated by a minimum of three Internet service providers for spam offenses.

(3)    Defendant Robert Russo is a resident of Maine who does business as Complaintremover.com and Defendmyname.com. He is also the CEO and owner of QED Media Group, LLC, an Internet service provider. Like Stanley, Russo is a member of the Defamation Action League. The state of organization of the QED Media Group is not Arizona.

(4)    Defendant Internet Defamation League is a limited liability company organized by Robert Russo.

### A. Stanley Threatened Magedson

(5) Defendants began contacting Magedson in approximately January 2007 on behalf of businesses that were angry about allegedly unwarranted or inaccurate public complaints that had been posted at ripoffreport.com. Russo and Stanely both stated that they would put Xcentric out of business if Magedson did not remove or privatize the complaints. Magedson refused to comply with these demands.

(6) Shortly thereafter, in February 2007, Stanley sent the following threat to Magedson:

> This letter is being sent to you in the name of more than 500 businesses. No matter where you go, we will cause you a problem. Your life is in danger until you comply with our demands. This is your last warning.
>
> Your neighbors already know about your criminal dealings and how you are making many people loose [sic] their business. You will soon be beaten to a pulp and pounced into the ground six feet under with a baseball bat and sleg [sic] hammer. You will soon be sorry not just from what I am capable of doing to you, but what other members will do as soon as they know exactly where you are. Its [sic] just a matter of time until I get to you.
>
> Here is what you can do to save your life. But you must act imidiatly [sic]. Make what ever deal it takes, you must comply.
>
> You have the previous list of companies that you need to remove from Rip-off Report. We know you hold the power. We know you have that list.
>
> You were provided an additional list several hours ago. It's too late for anything that we discussed today. No more deal. No more playing Mr Nice Guy. Now you must delete any of our members from your data base who have reports listed on any search engine.
>
> If not, BVA will drop you with in 24 hours. We will make thier [sic] life misrable [sic] like we have with Prolexic and gigenet. They don't like you either. We now know who your host is and the IP address to your servers.
>
> Those you do business with will be in danger and will be continusily [sic] be harassed till they stop doing business with you. We are contacting your advertisers.
>
> We will continue to spam you making it impossible for you to read your mail.

> Use the list you received in the past. I am told you know about that list and I know that you have gven [sic] a copy to the Mesa police.
>
> You must add to the list, anyone that sent you an email in the last year, asking you to remove the Reports on thier [sic] company.
>
> You must remove reports on search engines from companies that already had a lawsuit with you in the past and those presently. We do not care if you prevailed in the case or they settled with you. You must delete all those reports as well. Once you have reomoved [sic] those reports we will leave those who host you alone along with anyone else doing business with you. If not, consider this your final warning.
>
> Any threats from the past are not like theses [sic] threats. We will find you kill your dog and remove parts of your body one by one util [sic] your site is completely shut down. That is a threat you can to take to your bank of America.
>
> O YEAH - I HAVE A MESSAGE FOR YOU: HAVE A GREAT DAY ED

Exhibit 12.

(7) On the same day, Magedson also received the following letter from Stanley:

> We warned you ed magedson. Did you hear the gun shots last night? Because of you innocent people will die. Your tenants, family members and those that work with you. Think we're joking? I told you that your site will be down and it is. That is all we want and we will not hurt anyone.
>
> If ripoff report moves again to new hosting facilities you will not like what we will do next. Your home will burn. Those around you will burn. Do not expect any help from the police.
>
> As soon as you are up again ED. God help you. We will know exactly when you are up and where you are located. You will have 6 hours from that time to delete the the [sic] following listings on search engines.
>
> Helene Goldnadel, IPA, Tax Club, Boyajian Law, Chad Everett, Prosper Learning, Energy Automation Systems, Jim Rivas, 4x Made Easy, Warrantee Activation Headquarters along with any company suing you in Florida or has sued you in the past.
>
> Once you have completed with our first list we demand you remove we will give you another list on Saturday and every Saturday from this day forward and you will have 6 hours to do the same from the time we give you that list on each and every Saturday. If the Links work after the 6 there will be a man hunt for you.

> We know where you shop. We know where you bank. Greenfield and Broadway, Greenfield and Main. Are we getting closer ED? What about Basha's at Higley and Brown?
>
> We know the police will not bother with you but if you do go to the police you will suffer the consequences along with everyone around you. You've met your match ed. There will be no hiding. You should have played ball when I offered you the chance. You have no idea who you are playing with.

Doc. # 1, Exh. A at 2.

(8) In both of these letters, Stanely aimed to communicate to Magedson a serious expression of an intent to commit an act of unlawful violence.

**B. Stanley Made Disparaging Statements About Some of Xcentric's Service Providers**

(9) In retaliation for Plaintiffs' refusal to remove or privatize certain public complaints from the Ripoff Report, Stanley made disparaging statements about Magedson online and in emails and phone calls to various companies doing business with Xcentric. These include statements that Magedson is "one of the most notorious and prolific extortionists on the Internet today," a "scumbag," a "fugitive," a "wanted criminal . . . with a track record of fraudulent activity," a "con man," a "career criminal," and an individual who engages in "Blackmail schemes."

(10) The quoted statements about Magedson are false.

(11) The statements about Magedson bring him into disrepute and impeach his reputation.

(12) The statements about Magedson were published by Stanley to third parties via the Internet.

(13) At the very least, Stanley carelessly and unreasonably disregarded the falsity of his statements about Magedson.

(14) The statements about Magedson will adversely affect his business.

(15) Plaintiffs decided to file a lawsuit in response to Defendants' conduct. Plaintiffs' counsel, Maria Crimi Speth of the law firm Jaburg & Wilk, P.C., informed Russo of this decision. One day later, Stanley created the website Jaburgwilksucks.com, on which

it is stated that Speth is an "unethical attorney," an "Internet extortionist," and a "partner in the ripoff report extortion scam" who directs its everyday business, writes its checks, and uses its website to obtain referrals. Stanley also states that the attorneys at the law firm Jaburg & Wilk are "partners in slime." These statements were repeated on numerous other websites.

(16) The statements about Speth, her firm, and the other lawyers at her firm are false.

(17) The statements about Speth, her firm, and the other lawyers at her firm bring those individuals and the organization they work for into disrepute and impeach their reputations.

(18) The statements about Speth, her firm, and the other lawyers at her firm were published by Stanley to third parties via the Internet.

(19) At the very least, Stanley carelessly and unreasonably disregarded the falsity of the referenced statements about Speth, her firm, and the other lawyers at her firm.

(20) The referenced statements about Speth, her firm, and the other lawyers at her firm will adversely affect their business.

**C. Stanley and Russo Intentionally Interfered With Xcentric's Business Relationships**

(21) Xcentric possessed valid contractual relationships with the various Internet hosts, firewall service providers, and advertisers who had business ties to the Ripoff Report website.

(22) Stanley and Russo intentionally interfered with the contractual relationships between Xcentric and its various service providers by orchestrating a campaign of pressure and retaliation aimed at causing those businesses to cease working with Xcentric.

(23) Stanley and Russo's interference included a daily barrage of numerous phone calls and emails designed to harass the service providers into terminating their business relationships with Xcentric.

(24) For example, Stanley stated in an email to Prolexic Technologies, a provider of routing and Internet security services, that the members of the Internet Defamation League

would take legal action against Prolexic and call and write to both Prolexic and Prolexic's own service providers on a daily basis unless the company ceased providing its services to Xcentric.

(25) To the extent that Xcentric's service providers did not comply with the demands of Stanley and Russo, Stanley retaliated by creating websites that disparaged their businesses. One such site, pmgisucks.com, targets the marketing firm Professional Media Group, Inc. ("PMGI"), and states that PMGI is "partners" with an "extortionist." The site also publicizes the home address of at least one employee and the names of PMGI's clients. The site bryanvincentassociates.com, also created by Stanley, discloses the address, value, and title information pertaining to the personal residence of the president of Bryan Vincent Associates, Inc., another entity with which Xcentric did business.

(26) In other efforts to retaliate, Stanley hacked into service-provider databases to obtain customer lists and contact information. Stanley used the lists to send messages directly to the customers, stating that the entities with whom the customers did business supported a known extortionist in Magedson. Stanley also posted lists of the customers' email addresses online.

(27) Stanley retaliated directly against Magedson by orchestrating several distributed denial-of-service ("DDoS") attacks on Xcentric's servers. The attacks overloaded the servers with high volumes of spurious requests for information and caused the servers to shut down.

(28) Stanley further retaliated by sending spam email to all of Xcentric's customers and advertisers. The emails demanded that the recipients stop doing business with Xcentric.

(29) Stanley and Russo knew of the existence of the contractual relationships between Xcentric and its various service providers at the time they began interfering with those relationships.

(30) As a direct result of the campaign orchestrated by Stanley and Russo, numerous Internet hosts, firewall services, and advertising firms have successively terminated their business relationships with Xcentric.

(31) The campaign orchestrated by Stanley and Russo has directly interfered with Plaintiffs' ability to do business by frustrating the operation of Plaintiffs' website and requiring substantial efforts to restore compromised databases, change hosts, and replace firewall services.

(32) The campaign orchestrated by Stanley and Russo has forced Plaintiffs to spend between $120,000 and $200,000 switching, moving, and rebuilding Internet servers.

(33) This court entered a temporary restraining order on May 11, 2007 (Doc. # 6), that prohibits Defendants from knowingly sending or causing to be sent any threatening communications (other than threats to engage in lawful activity) to any company that provides Internet or hosting services to Xcentric, knowingly sending or causing to be sent any false or misleading communications to any company that provides Internet or hosting services to Xcentric that attempts to convince that company to discontinue providing hosting or Internet services to Xcentric, knowingly sending spam emails falsely disparaging any company that Defendants know provides services to Xcentric, knowingly sending or causing to be sent any threatening communications (other than threats to engage in lawful activity) to any company that advertises or has advertised on Ripoff Report, and knowingly sending or causing to be sent any threatening communications (other than threats to engage in lawful activity) to any customer of Xcentric.

(34) Stanley violated the temporary restraining order by knowingly sending spam emails that falsely disparaged Speth and Jaburg & Wilk.

(35) Stanley created the websites jaburgwilksucks.com, mariaspeth.com, and mariacrimispeth.com after the issuance of the temporary restraining order.

(36) Absent a court order, Stanley and Russo will continue to tortiously interfere with Xcentric's business relationships.

### D. Stanley Cast Magedson and the Attorneys at Jaburg & Wilk in a False Light

(37) Stanley's representations that the attorneys at Jaburg & Wilk are "partners in slime" and that Speth is an "unethical attorney," an "Internet extortionist," and a "partner in the ripoff report extortion scam" place the targeted individuals in a false light.

(38) The representations would be highly offensive to a reasonable person.

(39) Stanley had knowledge of or acted in reckless disregard of the falsity of the publicized representations and the false light in which they would place Speth and her co-workers at Jaburg & Wilk.

(40) Stanley's representations that Magedson is an "extortionist," a "career criminal," a "fugitive," a "con man," an individual who orchestrates "Blackmail schemes," a "wanted criminal," and a "scumbag" cast Magedson in a false light.

(41) The representations about Magedson would be highly offensive to a reasonable person.

(42) Stanley had knowledge of or acted in reckless disregard of the falsity of the publicized representations and the false light in which they would place Magedson.

### E. Stanley Willfully Used Copyrighted Material Without Permission

(43) The websites jaburgwilksucks.com, mariaspeth.com, and mariacrimispeth.com contain photographs of lawyers at Jaburg & Wilk.

(44) The copyrights to the photographs are owned by Jaburg & Wilk.

(45) Stanley willfully used the copyrighted photographs without permission when he posted them online.

### F. Stanley Gave Publicity to Matters Concerning the Private Lives of Others

(46) Stanley's online disclosure of the address, value, and title information pertaining to the personal residence of the president of Bryan Vincent Associates, Inc., would be highly offensive to a reasonable person.

(47) The information disclosed is not of legitimate concern to the public.

1  **II.    Conclusions of Law**

2      **A.    Irreparable Harm**

3      (1)  There is a likelihood of irreparable harm to the reputation and business of
4  Plaintiffs and Plaintiffs' counsel if this order is not entered.

5      **B.    Likelihood of Success on the Merits**

6      (2)  For each of the issues discussed below, Plaintiffs have demonstrated a strong
7  likelihood of success on the merits.

8          **1.    Threats**

9      (3)  "The hallmark of the protection of free speech is to allow 'free trade in
10 ideas'–even ideas that the overwhelming majority of people might find distasteful or
11 discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003).  However, "the protections
12 afforded by the First Amendment . . . are not absolute," and it has long been recognized that
13 the government may regulate some categories of expression consistent with the Constitution.
14 *Id.*  One such category consists of "true threats," or "those statements where the speaker
15 means to communicate a serious expression of an intent to commit an act of unlawful
16 violence to a particular individual or group of individuals." *Id.* at 359.  The speaker "need
17 not actually intend to carry out the threat" in order for this category to apply, *id.* at 360, but
18 he must "subjectively intend[] the speech as a threat," *United States v. Cassel*, 408 F.3d 622,
19 633 (9th Cir. 2005).

20     (4)  The letters sent by Stanley to Magedson on February 13, 2007, constitute true
21 threats because they were subjectively intended as threats by Stanley.

22         **2.    Defamation**

23     (5) The tort of defamation requires "(a) a false and defamatory statement concerning
24 another; (b) an unprivileged publication to a third party; (c) fault amounting at least to
25 negligence on the part of the publisher; and (d) either actionability of the statement
26 irrespective of special harm or the existence of special harm caused by the publication."
27 Restatement (Second) of Torts § 558 (1977). Defamatory statements "must be false and must
28 bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's

honesty, integrity, virtue, or reputation." *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341, 783 P.2d 781, 787 (1989). Where the target of the statement is a private person, liability will attach if the publisher "knows that the statement is false and that it defames the other," "acts in reckless disregard of these matters," or "acts negligently in failing to ascertain them." Restatement (Second) of Torts § 580B. A defamatory statement will only be actionable in the absence of special harm if it is libelous or imputes to the targeted individual a criminal offense, a "loathsome disease," serious sexual misconduct, or conduct that would adversely affect the target's "fitness for the proper conduct of his lawful business." *Id.* at §§ 569, 570, 573, 575.

(6) Stanley committed the tort of libel by publishing online false statements that the attorneys at Jaburg & Wilk are "partners in slime" and that Speth is an "unethical attorney," an "Internet extortionist," and a "partner in the ripoff report extortion scam." The statements were published in at least reckless disregard of their falsity.

(7) Stanley committed the tort of libel by publishing online false statements that Magedson is a "scumbag," an "Internet extortionist," a "wanted criminal," a "fugitive," an individual who orchestrates "blackmail schemes," a "career criminal," and a "con man." The statements were published in at least reckless disregard of their falsity.

### 3. Tortious Interference

(8) Tortious interference requires a plaintiff to prove: "(1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly." *Safeway Ins. Co. v. Guerrero*, 210 Ariz. 5, 10, 106 P.3d 1020, 1025 (2005). Whether interference is "improper" is generally determined by "weighing the social importance of the interest the defendant seeks to advance against the interest invaded." *Id.* at 11, 106 P.3d at 1026. Factors considered in this analysis include the "nature of the actor's conduct," "the actor's motive," "the interests of the other with which the actor's conduct interferes," "the interests sought to be advanced by the actor," "the social interests in protecting the freedom of action

of the actor and the contractual interests of the other," "the proximity or remoteness of the actor's conduct to the interference," and "the relations between the parties." Restatement (Second) of Torts § 767.

(9) Stanley and Russo tortiously interfered with Xcentric's valid contractual relationships by intentionally inundating Xcentric's business partners with antagonistic emails and phone calls in an effort to cause the business partners to terminate their relationships with Xcentric. This conduct was improper, caused the business partners to cease doing business with Xcentric, and resulted in financial and reputational injury to Plaintiffs.

(10) Stanley tortiously interfered with Xcentric's contractual relationships by defaming its business partners with domain names such as Jaburgwilksucks.com, posting sensitive personal information about the employees of the business partners online, hacking into the databases of the business partners to obtain customer and employee contact information without permission, and spamming Xcentric's customers and advertisers in an effort to dissuade them from continuing to work with Plaintiffs. This conduct was improper, caused the business partners to cease doing business with Xcentric, and resulted in financial and reputational injury to Plaintiffs.

### 4. False Light

(11) The tort of false light invasion of privacy occurs when a person (1) "gives publicity to a matter concerning another that places the other before the public in a false light," (2) "the false light in which the other was placed would be highly offensive to a reasonable person," and (3) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E. To be highly offensive to a reasonable person, the publicity "must involve a major misrepresentation of the plaintiff's character, history, activities or beliefs, not merely minor or unimportant inaccuracies." *Godbehere*, 162 Ariz. at 341, 783 P.2d at 787.

(12) Stanley committed the tort of false light invasion of privacy by describing the attorneys at Jaburg & Wilk as "partners in slime" and Speth as an "unethical attorney," an "Internet extortionist," and a "partner in the ripoff report extortion scam."

(13) Stanley committed the tort of false light invasion of privacy by describing Magedson as a "scumbag," a "fugitive," a "wanted criminal," an "extortionist," and a "career criminal."

### 5. Copyright Infringement

(14) 17 U.S.C. § 501 establishes that an individual who violates any of the exclusive copyrights of another is an infringer, and that the copyright owner is entitled to institute an action for infringement. *See* 17 U.S.C. §§ 501(a) and (b).

(15) Stanley is at least liable for infringement under section 501. Because the infringement was willful, criminal liability under 17 U.S.C. § 506 may also attach.

### 6. Invasion of Privacy

(16) One who "gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D.

(17) The disclosure of the address, value, and title information pertaining to the personal residence of the president of Bryan Vincent Associates, Inc., was an invasion of privacy.

(18) Plaintiffs are entitled to a preliminary injunction in the form filed herewith.

DATED this 21st day of June, 2007.

_____
Neil V. Wake
United States District Judge