Michael K. Dana (State Bar No. 019047)
Teresa K. Anderson (State Bar No. 024919)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
Attorneys for and Robert Russo, QED Media Group, L.L.C.,
and Internet Defamation League, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| XCENTRIC VENTURES, LLC, an Arizona corporation, d/b/a "RIPOFFREPORT.COM"; ED MAGEDSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM "BILL" STANLEY, an individual; WILLIAM "BILL" STANLEY d/b/a DEFAMATION ACTION.COM; WILLIAM "BILL" STANLEY d/b/a COMPLAINTREMOVER.COM; WILLIAM "BILL" STANLEY aka JIM RICKSON; WILLIAM "BILL" STANLEY aka MATT JOHNSON; ROBERT RUSSO, an individual; ROBERT RUSSO d/b/a COMPLAINTREMOVER.COM; ROBERT RUSSO d/b/a DEFENDMYNAME.COM; ROBERT RUSSO d/b/a QED MEDIA GROUP, L.L.C.; QED MEDIA GROUP, L.L.C.; QED MEDIA GROUP, L.L.C. d/b/a DEFENDMYNAME.COM; QED MEDIA GROUP, L.L.C. d/b/a COMPLAINTREMOVER.COM; DEFAMATION ACTION LEAGUE, an unincorporated association; and INTERNET DEFAMATION LEAGUE, an unincorporated association,<br><br>Defendants. | Case No. CV07-00954 PHX NVW<br><br>**DEFENDANTS/ COUNTERCLAIMANTS' RESPONSE TO MOTION TO DISMISS**<br><br>**(Oral Argument Requested)**<br><br>(Assigned to the Honorable Neil V. Wake) |

2018197.1

| | |
|---|---|
| 1 | ROBERT RUSSO, an individual; and QED MEDIA GROUP, L.L.C., |
| 2 | |
| 3 | Counterclaimants, |
| 4 | v. |
| 5 | XCENTRIC VENTURES, LLC, an Arizona corporation, d/b/a "RIPOFFREPORT.COM"; ED |
| 6 | MAGEDSON, an individual, |
| 7 | Counterdefendants. |

Counterclaimants Robert Russo and QED Media Group, L.L.C. (the "QED Parties") oppose Counterdefendant Magedson's June 15, 2007, Motion to Dismiss Counterclaims of Defendants Robert Russo ("Russo"), QED Media Group, L.L.C. ("QED Media Group") and Internet Defamation League.

The QED Parties' Counterclaim alleges numerous facts, including compelling facts completely ignored by Magedson's Motion to Dismiss, that are more than sufficient to state a valid claim for Defamation and False Light. Accordingly, Magedson's Motion to Dismiss should be denied.

### 1. INTRODUCTION

In a telephone conversation between Magedson and one of QED Media Group's customers, Magedson launched an accusation against the QED Parties that is among the most damaging and defamatory accusations that can be made in today's cultural climate: Magedson accused the QED Parties of terrorism. Magedson also accused them of threatening Magedson's life and committing numerous crimes.

While well-pleaded facts alone are sufficient to defeat a motion to dismiss, Magedson's accusations of terrorism, murder threats, and other criminal conduct derive from more than the QED Parties' well-pleaded counterclaim. Indeed, Magedson's own exhibits that he used during the preliminary injunction hearing include a batch of telephone transcripts containing the transcript in which Magedson makes these unequivocal defamation-per-se accusations. (*See* 5/17/2007 Hearing Exhibit 10 at "Call

6 Ed Magedson and Devon of Prosper Learning.") In other words, Magedson himself produced the very evidence that not only provides support for the QED Media Parties' well-pleaded allegations that survive dismissal, but that would even assure defeat of a summary judgment motion. Astonishingly, Magedson's Motion to Dismiss completely ignores the allegations based on these key facts.

What's more, support for the QED Parties' counterclaims is not limited to Magedson's communications with QED Media Group's client. The QED Parties' First Amended Counterclaim alleges that Magedson repeated his accusations of terrorism against the QED parties to others, including other clients of QED Media Group and numerous members of the professional media. Accordingly, Magedson's Motion to Dismiss should be denied.

## 2. THE QED PARTIES' WELL-PLEADED ALLEGATIONS

In reviewing Magedson's Motion to Dismiss, "[a]ll allegations of material fact" in the QED Parties' 6/6/07 First Amended Counterclaim ("FAC")[1] " are taken as true and construed in the light most favorable" to the QED Parties. *Vignolo v. Miller*, 120 F.3d 1075, 1077 (9th Cir. 1997). Counts One and Two "should not be dismissed unless it appears beyond doubt" that the QED Parties "can prove no set of facts" in support of their claim that would entitle them to relief. *Id.* The following facts must be taken as true for purposes of Magedson's Motion:[2]

QED Media Group is an internet service provider with offices in the United States, South America, Canada, the UK, and Central Europe. (FAC ¶ 7.) QED Media Group provides its clients with an array of services, including software design, website

---

[1] On June 26, 2007, the QED Parties filed a Motion for Leave to File Second Amended Answer and Counterclaim, and a copy of which was lodged along with that filing. Because that Motion has not yet been granted, and because Magedson's Motion to Dismiss focuses on allegations in the First Amended Answer and Counterclaim, this Opposition addresses the allegations in the First Amended Answer and Counterclaim only.

[2] Magedson introduced his Motion to Dismiss with a rendition of unsupported allegations from Magedson's **own** Complaint. (*See* Motion to Dismiss at 2-4.) The QED Parties will demonstrate through discovery and disclosure that those allegations as they pertain to the QED Parties are not supported by the evidence. Moreover, none of those allegations have any bearing on whether Counts One and Two of the QED Defendants' Counterclaim state a claim upon which relief may be granted.

2018197.1

design, front office support, internet marketing, and public relations. (FAC ¶ 8.) As part of its public relations services, QED Media Group uses a host of lawful reputation management strategies to protect its clients' reputations from the publication and dissemination of defamatory information about those clients on the internet. (FAC ¶ 9.) QED Media Group's services and strategies are widely used and accepted in the online industry. (FAC ¶ 9.)

QED Media Group's reputation management strategies are aimed at removing defamatory information about QED Media Group's clients from the internet or minimizing the ability to access such misinformation through internet searches. (FAC ¶ 10.) Among these strategies, QED Media Group communicates directly with website operators about revising or removing defamatory information. (FAC ¶ 11.) In addition, QED Media Group employs various techniques and technologies that optimize the search engine profiles of its clients by lowering the ranking of search results that contain defamatory content. (FAC ¶ 11.) QED Media Group's reputation management strategies assist clients with combating the destructive impact of defamatory content easily accessible by anyone with an internet connection from anywhere in the world. (FAC ¶ 12.)

An inordinate number of calls to QED Media Group for its services come from clients who have been defamed by content on Counterdefendant Magedson's website, ripoffreport.com. (FAC ¶ 15.) Magedson and his company, Xcentric Ventures, operate ripoffreport.com, which is also accessible through the web address badbusinessbureau.com. (FAC ¶ 16.) On his website, Magedson encourages users to anonymously post disparaging information about companies and individuals believed by ripoffreport.com users to "ripoff consumers." (FAC ¶ 17.) Once these ripoff "reports" are published, they quickly climb to prominent positions in web search engine results. Often, a ripoff report will be ranked at or near the very top of search results, even above the victim's own company website. (FAC ¶ 18.) Magedson has admitted on his own

///

ripoffreport.com website that he changes "report titles" to "enhance" the reports' "ability to be found on search engines." (FAC ¶ 19.)

Magedson flaunts this policy to never remove reports while hiding behind the "safe harbor" provision of the Federal Communications Decency Act (the "CDA"), which Magedson believes gives him absolute immunity from liability for his actions. (FAC ¶ 23.) Magedson then uses the power of his ripoffreport.com website and his interpretation of the CDA as tools for extorting victims of these widely-published ripoff "reports." (FAC ¶ 24.) Specifically, Magedson offers to accept exorbitant sums of money to "update" disparaging ripoff reports as part of Magedson's so-called "Corporate Advocacy and Remediation Program." (FAC ¶ 24.)

In or around February 2006, Russo contacted Magedson on behalf of certain clients regarding certain defamatory ripoffreport.com reports about QED Media Group's clients that ranked at or near the top of search engine results. (FAC ¶ 26.) In several telephone conversations with Magedson, Russo attempted to negotiate with Magedson about possible options for removing such defamatory reports, or "privatizing" such reports so that they did not appear in web search results. (FAC ¶ 27.) Magedson was often sarcastic, angry, and rude, refusing to negotiate reasonably with Russo. (FAC ¶ 28.)

Because attempts to negotiate directly with Magedson were unsuccessful, QED Media Group relied on its other reputation management strategies to assist those clients who had become victims of Magedson's defamatory ripoff reports. (FAC ¶ 31.) As a result, the web search engine results for QED Media Group's clients improved, and the rankings of defamatory ripoff reports about those clients fell from the first page of search results. (FAC ¶ 31.)

In retaliation for QED Media Group's assistance to its clients, Magedson devised a scheme to defame the reputations of Russo and QED Media Group. (FAC ¶ 32.) In February, 2007, Magedson publicized defamatory remarks about Russo and QED Media Group to numerous members of the professional media. (FAC ¶ 33.) Specifically,

Magedson sent an email to numerous reporters that identified Russo's affiliation with QED Media Group and that accused Russo of being an "internet terrorist" and a member of an "internet terrorist organization." (FAC ¶ 34.) Magedson's email falsely suggests that Russo participated in sending Magedson two anonymous "letters" containing violent personal threats against Magedson, his family, and his dog. (FAC ¶ 35.) Those letters were attached to the email. (FAC ¶ 35.) Magedson has a history of accusing victims of his website who attempt to defend themselves with making death threats against Magedson. (FAC ¶ 36.) On information and belief, Magedson wrote the letters attached as Exhibit A to the FAC himself as part of his scheme to defame the reputations of Russo and QED Media Group. (FAC ¶ 36.)

Magedson publicized and continues to publicize, in many forums, his false defamatory accusations that Russo and QED Media Group are internet terrorists who make violent personal threats. (FAC ¶ 42.) On information and belief, these forums include face-to-face meetings, telephone conversations, written correspondence, emails, and internet message boards. (FAC ¶ 42.)

Magedson publicized his defamatory accusations against Russo and QED Media in telephone conversations with many of QED Media Group's clients. (FAC ¶ 43.) One such client is Prosper Learning, who hired QED Media Group to improve its search engine profile. (FAC ¶ 43.)

Magedson called Devon from Prosper Learning and attempted to bait Devon into suggesting that QED Media Group promised rip-off report removal services that QED Media Group did not provide. (FAC ¶ 44.) As Magedson often does, he secretly recorded his telephone conversation without Devon's knowledge. (FAC ¶ 44.) Devon rejected Magedson's false suggestion and explained QED Media Group's services exactly as offered by QED Media Group. (FAC ¶ 45.) Magedson pressed Devon, promising him that he "will not give [Devon] up, meaning [Magedson] will not let them know that [he was] talking with [Devon]." (FAC ¶ 46.)

///

2018197.1

Magedson then falsely told Devon that Russo "committed terrorist acts" and that Russo "threatened" Magedson's life.[3] (FAC ¶ 47.) Magedson then assured Devon that if for some reason Russo called Magedson, he would lie to Russo saying that he never spoke to Devon. (FAC ¶ 48.) Magedson then begged Devon to "[g]et really what [Devon] can on [Russo and Williams]," saying he needed "whatever information [Devon had] on them." (FAC ¶ 49.) Magedson then strongly reassured Devon that their conversation would be kept strictly confidential, saying to Devon, "There is no way I would give you guys up for anything. There's no way. Because that's my . . . you know . . . our deal. I'm never going to do anything to harm you guys." (FAC ¶ 49.) Shortly after Magedson's telephone conversation with Devon, Magedson had the recording of the conversation transcribed, and his attorneys introduced the transcript as an exhibit in the preliminary injunction hearing in this case, making public the entire conversation that Magedson had promised Devon to keep confidential. (FAC ¶ 50.) As a result of Magedson's conversation with Devon, QED Media Group lost its contract with Prosper Learning. (FAC ¶ 51.)

The allegations asserted by Magedson about the QED Parties as described above are false, disparaging, derogatory, and misleading. (FAC ¶ 55.) Magedson made those statements knowing of their falsity, or in reckless disregard for their truth. (FAC ¶ 56.) Such false statements were made by Magedson to third parties, including members of the professional media. (FAC ¶ 57.) Such false statements have caused and continue to cause injury to Russo's and QED Media Group's reputations. (FAC ¶ 58.) As a direct and proximate result of Magedson's defamation, Russo and QED Media Group have been damaged in an amount to be proven at trial. (FAC ¶ 59.) Moreover, Magedson's defamatory allegations are actionable per se (FAC ¶ 60.)

Magedson's statements and actions as described above have placed Russo and QED Media Group in a false light. (FAC ¶ 63.) The false light in which Russo and QED Media Group have been placed as a result of Magedson's statements and actions

---

[3] The portion of FAC ¶ 47 stating that Magedson "threatened Russo's life" is an error that is corrected in the QED Parties' Third Amended Complaint.

2018197.1

- 7 -

Case 2:07-cv-00954-NVW    Document 40    Filed 07/06/2007    Page 7 of 12

would be highly offensive to a reasonable person. (FAC ¶ 64.) Magedson knew that the statements and impressions created by his actions were false, or Magedson acted in reckless disregard for the truth or falsity of those statements and impressions. (FAC ¶ 65.) As a direct and proximate result of Magedson's wrongful statements and actions, Russo and QED Media Group have been damaged in an amount to be proven at trial. (FAC ¶ 66.)

**3. BASED ON THE WELL-PLEADED ALLEGATIONS SET FORTH IN SECTION 2 ABOVE, COUNTS ONE AND TWO OF THE QED PARTIES' FAC STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED.**

Counts One and Two of the FAC are based on an abundance of clear specific defamatory statements by Magedson:

- Magedson told numerous members of the professional media that the QED Parties were "internet terrorists" and members of an "internet terrorist organization"; (FAC ¶ 34.)
- In his email to members of the professional media, Magedson accused the QED Parties of making the following threats of violent criminal activity:
    - That Magedson's home would "burn" and that "those around" Magedson would "burn";
    - That Magedson's life was in danger;
    - That Magedson would be "beaten to a pulp and pounced to the ground six feet under with a baseball bat and sleg [sic] hammer."
    - That Magedson's dog would be killed; and
    - That parts of Magedson's body would be removed. (Exhibit A to FAC.)
- Magedson publicized and continues to publicize in many forums, his false defamatory accusations that the QED Parties are internet terrorists who make violent personal threats. These forums include face-to-face meetings, telephone conversations, written correspondence, emails, and internet message boards; (FAC ¶ 42.)
- Magedson told QED Media Group's customer, Prosper Learning, that Russo

2018197.1

"committed terrorist acts" and threatened "Magedson's Life." (FAC ¶ 47.)

Magedson's defamatory allegations against the QED Parties are so vitriolic that they constitute defamation per se, and the QED Parties' damages are presumed. *See Roscoe v. Schoolitz*, 105 Ariz. 310, 312, 464 P.2d 333, 335 (1970) (publication of criminal charges or criminal acts is actionable per se); *Broking v. Phoenix Newspapers*, 76 Ariz. 334, 337, 264 P.2d 413, 415 (1953) (charging person with substance of a crime is actionable per se); *McClinton v. Rice*, 76 Ariz. 358, 364, 265 P.2d 425, 429 (1953) (Charge of having sent an obscene letter through the mail is defamatory per se).

Rather than confronting these clear, precise, defamatory allegations in the FAC, Magedson's Motion to Dismiss employs the puzzling tactic of pretending that those allegations do not exist. For example, Magedson asserts that the QED Parties' allegations are "vague" and non-exact, do not provide Magedson with "fair notice" of the claims against him, and make it "simply impossible to understand what it is that counterclaimants allege was defamatory." (Motion to Dismiss at 8-9.) Likewise, Magedson's discussion of the QED Parties' Count Two False Light Claim fails to address any of the statements that put the QED Defendants in a false light. At a minimum, those statements unquestionably place the QED Parties "in a false light highly offensive to a reasonable person." *See Godbehere v. Phoenx Newspapers, Inc.*, 162 Ariz. 335, 340, 783 P.2d 781, 786 (1989). Moreover, as alleged by the FAC, Magedson knew that the statements and impressions created by his actions were false, or Magedson acted in reckless disregard for the truth or falsity of those statements and impressions. (FAC ¶ 65.)

As is the case during the initial stages of every lawsuit, certain of QED Parties' more general allegations have yet to be fleshed out because discovery has not yet begun.[4]

---

[4] Magedson suggests that the QED Parties' allegation of statements made to "numerous members of the professional media is a "rather strong charge," implying that evidence would not support this claim. Again however, this allegation is to be taken as true and should be construed in the light most favorable to the QED Parties. *Vignolo v. Miller*, 120 F.3d 1075, 1077 (9th Cir. 1997). Moreover, Counsel has a duty under Rule 11, Federal Rules of Civil Procedure, to include only allegations that Counsel believes have or are likely to have, evidentiary support.

2018197.1

Nevertheless, the FAC's allegations of numerous specific defamatory accusations that are actionable per se are more than sufficient to support the QED Parties Count One Defamation Claim.

**4. NONE OF THE DEFAMATORY STATEMENTS THAT SUPPORT COUNTS ONE AND TWO OF THE QED PARTIES' FAC ARE PROTECTED BY ANY PRIVILEGE.**

Magedson asserts that the report he filed with the Mesa Police Department and the filing of his Complaint are not actionable because they are privileged. (Motion to Dismiss at 6-7.) However, as discussed in Sections 3 and 4 of this Response, these actions by Magedson do not comprise the factual basis for Counts One and Two of the QED Parties FAC. The allegations regarding Magedson's filing of a police report, statements to the Mesa Police Department, and Magedson's decision to file this lawsuit were included for purposes other than to identify particular defamatory statements or other actions that support Counts One and Two.[5]

The allegations discussed in Sections 3 and 4 of this Response, which again were not even addressed by Magedson's Motion to Dismiss, stand on their own to support Counts One and Two, and are not protected by any privilege. The judicial privilege protects "communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as part of, a judicial proceeding" in which the speaker participates, "if the matter has some relation to the proceeding." *Hall v. Smith*, 214 Ariz 309, __, 152 P.3d 1192, 1195 (App. 2007). The recipient of that communication "must have had a close or direct relationship to the proceeding for the privilege to apply." *Id.* at __, 152 P.3d at 1196.

Magedson's defamatory statements discussed in Sections 3 and 4 of this response were not made to any recipients having a "close or direct relationship" to this proceeding. In *Green Acres Trust v. London*, 141 Ariz. 609, 613, 688 P.2d 617, 621

---

[5] For example, those allegations contribute to the context in which Magedson engaged in his scheme to defame the QED Parties, are based on evidence that impeaches Magedson's credibility, and may be relevant to Count Three of the FAC, which Magedson did not seek to dismiss. *See generally Safeway Ins. Co. v. Guerrero*, 207 Ariz. 82, 83 P.3d 560, 563 (App. 2004) *vacated on other grounds* 210 Ariz. 5, 106 P.3d 1020 (2005) (conduct "reasonably connected" with judicial proceeding was not protected by the litigation privilege for purposes of tortious interference.)

2018197.1

- 10 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1 (1984), the Arizona Supreme Court rejected a party's claim that communications to a newspaper report were protected by the privilege:

> The report played no role in the actual litigation other than that of a concerned observer. Since the reporter lacked a sufficient connection to the proposed proceedings, public policy would be ill served if we immunized the communications made to the reporter by the lawyer defendants. The press conference simply did not enhance the judicial function and no privileged occasion arose. Accordingly, the lawyer defendants were not absolutely privileged to publish the oral and written communications to the newspaper reporter.

*Id.* at 615, 688 P.2d at 623. Likewise, neither the reporters who received Magedson's defamatory emails nor QED Media Group's clients play any "role" in this litigation, and they all lack any "connection" to the proceedings. Public policy would be ill served if Magedson were permitted to (1) fabricate false accusations against the QED Parties that they are terrorists and violent criminals, (2) disseminate those accusations to QED Media Group's valuable clients and members of the professional media; and then (3) seek protection under the cloak of the "judicial privilege" by filing this lawsuit. The judicial privilege has no bearing on the allegations supporting Counts One and Two.

**5.    CONCLUSION**

For the reasons set forth above, Magedson's Motion to Dismiss should be denied.

DATED this 6th day of July, 2007.

                SNELL & WILMER L.L.P.

                By  /s/ Michael K. Dana
                    Michael K. Dana
                    Teresa K. Anderson
                    One Arizona Center
                    400 E. Van Buren
                    Phoenix, AZ 85004-2202
                Attorneys for Robert Russo, QED Media Group, L.L.C. and Internet Defamation League, LLC

2018197.1

# **CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2007 I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing to the following CM/ECF participant:

>Maria Crimi Speth
>Jaburg & Wilk
>3200 North Central Avenue
>Suite 2000
>Phoenix, Arizona 85012
>Attorneys for Plaintiffs
>mcs@jaburgwilk.com

I further certify that on July 6, 2007, I served a courtesy copy of the aforementioned document and transmittal of a Notice of Electronic Filing by mail on the following:

>The Honorable Neil V. Wake
>United States District Court
>401 West Washington Street,
>Phoenix, Arizona 85003

/s/ E. E. Szafranski