Kraig J. Marton, #003816
kjm@jaburgwilk.com
Maria Crimi Speth, #012574
mcs@jaburgwilk.com
Adam S. Kunz, #018827
ask@jaburgwilk.com
Laura A. Rogal, #025159
lar@jaburgwilk.com
**JABURG & WILK, P.C.**
3200 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 248-1000

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| XCENTRIC VENTURES, LLC, an Arizona corporation, d/b/a "RIPOFFREPORT.COM"; ED MAGEDSON, an individual<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM "BILL" STANLEY, an individual; WILLIAM "BILL" STANLEY d/b/a DEFAMATION ACTION.COM; WILLIAM "BILL" STANLEY d/b/a COMPLAINTREMOVER.COM; WILLIAM "BILL" STANLEY aka JIM RICKSON; WILLIAM "BILL" STANLEY aka MATT JOHNSON; ROBERT RUSSO, an individual; ROBERT RUSSO d/b/a COMPLAINTREMOVER.COM; ROBERT RUSSO d/b/a DEFENDMYNAME.COM; ROBERT RUSSO d/b/a QED MEDIA GROUP, L.L.C.; QED MEDIA GROUP, L.L.C.; QED MEDIA GROUP, L.L.C. d/b/a DEFENDMYNAME.COM; QED MEDIA GROUP, L.L.C. d/b/a COMPLAINTREMOVER.COM; DEFAMATION ACTION LEAGUE, an unincorporated association; and INTERNET DEFAMATION LEAGUE, an unincorporated association;<br><br>Defendants. | Case No: 07-954-PHX-NVW<br><br>**MEMORANDUM OF LAW IN SUPPORT OF FINDING QED MEDIA GROUP, LLC IN CONTEMPT** |

Plaintiffs Xcentric Ventures, LLC and Edward Magedson (collectively, "Plaintiffs") hereby submit their Memorandum of Law addressing the authority of this Court to find Defendant QED Media Group, LLC in contempt for violations of the Preliminary Injunction dated June 21, 2007.

## I. **INTRODUCTION**

Plaintiffs request that the Court find Defendant QED Media Group, LLC ("QED") in contempt for its actions and inactions in violation of the Preliminary Injunction issued by this Court on June 21, 2007. In its Findings of Fact and Conclusions of Law dated June 21, 2007, this Court determined that the relationship between Defendants William Stanley and Robert Russo is inextricably intertwined. As testified to by Russo at the hearing on November 1, 2007, that relationship *has not changed*, and therefore, further evidence of that relationship need not be presented to the Court. Interestingly enough, Russo also presented testimony of a previously unexplored relationship – the relationship between Stanley and QED. As the President of QED, Russo has intimate knowledge of the workings of QED, as well as any employment and agency relationships established by QED. Despite Russo's labeling of Stanley as a "reseller" for QED, the extent of the relationship between Stanley and QED is much more than that term would connote. As the evidence presented to this Court demonstrates, the relationship between Stanley and QED rises to such a level that QED can and should be liable for the actions of Stanley under a theory of respondeat superior.

Plaintiffs are aware that the Court has questioned whether QED's "hands-off" attitude towards the actions of Stanley can constitute contempt. However, "[o]nce it is determined that the corporate <u>agent</u> willfully violated a clear contempt order, <u>the corporation must bear responsibility</u>." *U.S. v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 661 (2d Cir. 1989) (emphasis added). The Court has already made a determination that Stanley is in contempt of this Court's Preliminary Injunction. It is indisputable that QED must bear responsibility for Stanley's actions.

2

10297-14/LAR/DSG/620729_v2

When considering the liability of QED for Stanley's direct violation of the Preliminary Injunction, the Court should also note that an order binds parties *and* those in active concert with parties who have actual knowledge of the order. *U.S. v. Laurins*, 857 F.2d 529, 535 (9th Cir. 1988); *see* Fed.R.Civ.P. 65(d); *United States v. Baker,* 641 F.2d 1311, 1314 (9th Cir.1981). Unquestionably, QED was aware of the Preliminary Injunction. Furthermore, an order to a corporation binds those who are legally responsible for the conduct of its affairs. *NLRB v. Maine Caterers, Inc.*, 732 F.2d 689, 691 (1st Cir.1984); *see United States v. Wilson*, 221 U.S. 361, 376, 31 S.Ct. 538, 542-43, 55 L.Ed. 771 (1911). At a minimum, QED is liable for contempt for its failure to comply with the Preliminary Injunction. In addition, because Stanley was acting as an agent of QED, and because it is undisputed that Stanley violated the Preliminary Injunction, QED is liable for Stanley's contumacious acts.

## II. CIVIL CONTEMPT IS PROCEDURALLY PROPER UNDER THE FACTS PRESENTED

"[C]ourts have [the] inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (quoting *Shillitani v. United States*, 384 U.S. 364, 368, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966)); *accord Waffenschmidt v. MacKay*, 763 F.2d 711 (5th Cir. 1985) ("Courts possess the inherent authority to enforce their own injunctive decrees.") A party may be held in civil contempt where it "fail[ed] to take all reasonable steps within the party's power to comply [with a specific and definite court order]." *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993). Willfulness is not an element of contempt. *Id.* ("[T]here is no good faith exception to the requirement of obedience to a court order").

Civil contempt is ordinarily used to compel compliance with an order of the Court, although in some circumstances a civil contempt sanction may be designed to

3

10297-14/LAR/DSG/620729_v2

Case 2:07-cv-00954-NVW    Document 97    Filed 11/09/2007    Page 3 of 11

"compensate[ ] the complainant for losses sustained." *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 828-829, 114 S.Ct. 2552, 2557-2558, 129 L.Ed.2d 642 (1994).

"The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definitive order of the court." *Federal Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999) (citation omitted); *Federal Trade Comm'n v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1211 (9th Cir. 2004). Once the moving party has met that burden, "[t]he burden then *shifts* to the contemnors to demonstrate why they were unable to comply." *Id.* (emphasis added).

### III.  THE PRINCIPAL IS LIABLE FOR THE CONDUCT OF ITS AGENT

QED is liable for Stanley's conduct because Stanley was, and is, QED's agent acting within the scope of his agency. An agent is one who acts on behalf of another. *Barlage v. Valentine,* 210 Ariz. 270, 275, 110 P.3d 371, 376 (App. 2005). An essential element of the principal-agent relationship is the ability of the agent to act on behalf of his principal with third parties. *Equitable Life & Cas. Ins. Co. v. Rutledge*, 9 Ariz.App. 551, 555, 454 P.2d 869, 873 (1969), citing *Valley Nat'l Bank v. Milmoe*, 74 Ariz. 290, 248 P.2d 740 (1952); *see also In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir.1997) ("One of the chief characteristics of an agency relationship is the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties."). Thus, when an agent acts, it is as if the principal himself has acted. *Barlage,* 210 Ariz. at 275, 110 P.3d at 376.

There are two types of agency, express and apparent. *Curran v. Indus. Comm'n*, 156 Ariz. 434, 437, 752 P.2d 523, 526 (App.1988). If the principal has delegated authority by oral or written words which authorize the agent to do a certain act or series of acts, then the authority of the agent is express. *See Id.* Apparent agency exists when "the principal has intentionally or inadvertently induced third persons to believe that such a person was its agent although no actual or express authority was conferred on him as agent." *Id.*

4

Similarly, an employer is vicariously liable for the negligent or tortious acts of its employee acting within the scope and course of employment. *See Wiper v. Downtown Development Corp.*, 152 Ariz. 309, 310, 732 P.2d 200, 201 (1987*); see also Robarge v. Bechtel Power Corp.*, 131 Ariz. 280, 283, 640 P.2d 211, 214 (1982). Conduct falls within the scope if it is the kind the employee is employed to perform, it occurs within the authorized time and space limits, and furthers the employer's business even if the employer has expressly forbidden it. *See Smith v. American Express Travel Services*, 179 Ariz. 131, 135-36, 876 P.2d 1166, 1170-71 (1994); *Ohio Farmers Ins. Co. v. Norman*, 122 Ariz. 330, 331-32, 594 P.2d 1026, 1027-28 (1979). See also *Santiago v. Phoenix Newspapers, Inc.*, 164 Ariz. 505, 508-09, 794 P.2d 138, 141-42 (1990) (whether a master-servant relationship exists is an objective determination to be made by the trier of fact).

"The general rule is that while an employer is liable for the negligence of its employee under the doctrine of respondeat superior, an employer is not liable for the negligence of an independent contractor." *Wiggs v. City of Phoenix* (*Wiggs II*), 198 Ariz. 367, 369, ¶ 7, 10 P.3d 625, 627 (2000). There is, however, an exception to that rule where there is a non-delegable duty. *Id.* (citing *Ft. Lowell-NSS Ltd. P'ship v. Kelly*, 166 Ariz. 96, 104, 800 P.2d 962, 970 (1990) (finding possessor of land vicariously liable for invitees' injuries even though they were caused by an independent contractor)). Therefore, if an employer delegates performance of a special duty to an independent contractor, and the independent contractor is negligent, the employer remains liable for any resulting injury as if the employer itself had been negligent. *See Id.* This exception exists because certain duties of an employer are so important that the employer cannot escape liability by delegating performance to another. *See Id.*

The *Wiggs II* court held that while an independent contractor is never a servant, it does not always follow that an independent contractor is never an agent. *Wiggs II*, 198 Ariz. At 369, ¶ 10, 10 P.3d 625 (citing Restatement (Second) of Agency § 2 cmt. b (1958)). Such is the case because a client or principal instructs the independent contractor

5

10297-14/LAR/DSG/620729_v2

Case 2:07-cv-00954-NVW    Document 97    Filed 11/09/2007    Page 5 of 11

or agent on what to do but not how to do it. *Id.* And, where there is a non-delegable duty, the principal is liable for the negligence of the agent, whether the agent is an employee or independent contractor. *Id.* (citations omitted).

## IV. <u>QED MEDIA GROUP, LLC IS LIABLE FOR CONTEMPT</u>

### A. <u>The Language Of The Preliminary Injunction Specifically Obligates QED Media Group, LLC</u>

#### 1. <u>QED Media Group, LLC was enjoined from making further defamatory statements</u>.

The Preliminary Injunction states:

> Defendants and their officers, agents, employees, independent contractors, or other persons acting under their supervision and control or at their request are preliminarily enjoined from . . . Knowingly making, or causing to be made, and transmitting to any third party any false and defamatory statement or representation . . . Posting on an Internet website or using in a domain name any false and defamatory statement or representation . . .

As used above, the term "Defendants" is an inclusive one, referencing both QED and Stanley. Specifically, no postings (or re-postings) were allowed to be made by QED. Importantly, the Preliminary Injunction also includes the phrase "knowingly making, or causing to be made" when referencing the transmittal of false and defamatory statements. As will be addressed further below, Russo (and, by virtue of his capacity as President, QED) knew that Stanley was in continuing violation of the Preliminary Injunction to their benefit. QED caused defamatory statements to be made on its behalf by Stanley, and therefore violated the Preliminary Injunction.

#### 2. <u>QED Media Group, LLC was required to ensure the removal of all defamatory statements and websites</u>

The Preliminary Injunction also directs Stanley to "make reasonable efforts to remove or have removed any content incompatible with this preliminary injunction . . ." Although the Preliminary Injunction only specifies that this responsibility belongs to

Stanley, the responsibility may be imputed to QED as well through Federal Rule of Civil Procedure Rule 65(d).

Rule 65(d) provides: "Every order granting an injunction… is binding only upon the parties to the action, their officers, <u>agents</u>, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." (emphasis added)  Even absent specific language requiring QED to be responsible for the removal of the false and defamatory content, the status of QED as both the principal of Stanley, as well as a "person in active concert or participation" with Stanley, necessitates that the portion of the Preliminary Injunction instructing the removal of the false and defamatory reports be directed to QED as well as Stanley. *See In re Transamerica Corp.*, 184 F.2d 319 (9th Cir. 1950), certiorari denied 71 S.Ct. 197, 340 U.S. 883, 95 L.Ed. 641, rehearing denied 71 S.Ct. 278, 340 U.S. 907, 95 L.Ed. 656, rehearing denied 71 S.Ct. 279, 340 U.S. 907, 95 L.Ed. 656 (A corporate party or officer of corporation who acts through agents is not less amenable to an injunction than is a natural person acting individually).

### B. William Stanley Is An Agent Of QED Media Group, LLC

Russo testified that QED makes "a very large profit each month" from clients who have contacted QED to get their name and/or company suppressed from www.ripoffreport.com.  *See* Transcript of Show Cause Hearing dated November 1, 2007 ("Transcript – Day 1"), p. 138 at line 17.  Stanley testified that he referred *all* clients he solicited who had issues with Rip-off Report to QED.  Stanley does not perform services for these clients; these clients who initially contact Stanley ultimately become clients of QED.  As a result of Stanley's referrals, QED and Russo have profited.  Stanley provided testimony which stated that his referrals generated "[m]aybe 7,000 or 8,000 [dollars] a month in new business" for QED.  Transcript – Day 1, p. 22 at line 8.  Russo also acknowledged the impact that Stanley has on QED's profits:

> Q. You didn't ask him to stop being a reseller even after the Court issued a preliminary injunction he violated?

7

10297-14/LAR/DSG/620729_v2

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

> A. Not only did I not ask him, it was a significant financial loss for our organization on a monthly basis.

Transcript – Day 1, p. 171 at lines 4-7. In his capacity as an agent of QED, Stanley is a material contributor to the financial well-being of QED.

Russo also testified that Xcentric's Corporate Advocacy Program is not only in direct competition with the services of QED, it is the *only* source of competition for the services of QED.[1] Transcript – Day 1, p. 146 at lines 9-11. A company that has a report filed about it on Rip-off Report can choose a variety of ways address that report. The company may file a rebuttal to any report posted on Rip-off Report, the filing of which is free. The company may choose not to respond at all. The company, if eligible, may become a member of the Corporate Advocacy Program. A final alternative is that the company may hire QED to perform search engine optimization and reputation management services. If the person chooses to utilize the Corporate Advocacy Program, QED earns nothing. It is therefore in QED's financial interest to promote its programs, while downplaying the effectiveness and quality of the Corporate Advocacy Program.

As the Court acknowledged, competition is the cornerstone of the American economy; however, such a principle only applies to competition that is achieved through lawful means. Stanley and Russo disseminated information throughout the Internet portraying Ed Magedson and the Corporate Advocacy Program as "extortion". The intent of this attack was simple and conniving—people would be less likely to become a member of Xcentric's Corporate Advocacy Program if they believed the false and defamatory statements made by Stanley and Russo. QED directly benefits when people utilize its services, not those of the Corporate Advocacy Program. By defaming Magedson, Stanley ensured that QED would reap the financial rewards of diverting business from the Corporate Advocacy Program to QED.

---

[1] Plaintiffs are aware that the Court has not made any determination of the legality of either party's services. However, for the purposes of this Memorandum, only the legality of the competition between the two services is at issue, not the legality of the services themselves.

8

### C. QED Media Group, LLC Can Be Held In Contempt

"A corporation is guilty of criminal contempt when its <u>agents</u> violate a court order with knowledge that the order has been issued." *U.S. v. 22 Rectangular or Cylindrical Finished Devices, More or Less, STER-O-LIZER MD-200...Halogenic Products Co.*, 941 F.Supp. 1086, 1095 (D.Utah 1996) (emphasis added); *see also United States v. Greyhound Corp.*, 370 F.Supp. 881 (N.D.Ill.), aff'd, 508 F.2d 529 (7th Cir.1974). As Plaintiffs have addressed in their Memorandum of Law in Support of Criminal Contempt filed concurrently herewith, a finding of criminal contempt carries with it a higher burden of proof than one of civil contempt. It can be reasonably deduced that if QED would be automatically guilty of criminal contempt for the contemptuous actions of Stanley, it necessarily must be guilty of civil contempt which requires a *lower* burden of proof.

Russo has attempted to pawn off the entire responsibility for the contemptuous actions squarely onto Stanley. His defense, repeated as a refrain throughout his testimony, was that he did not control the actions of Stanley. However, a "corporation cannot hide behind the cloak of an unfaithful employee defenses in civil contempt proceeding. Under common law principles of respondeat superior, <u>a principal is liable for the deceit of its agent, if committed in the very business the agent was appointed to carry out. This is true even though the agent's specific conduct was carried out without the knowledge of the principal</u>." *Commodity Futures Trading Commission v. Premex*, Inc., 655 F.2d 779 (C.A.Ill., 1981) (emphasis added). There was no testimony presented that specifically describes the "scope" of Stanley's employment or agency relationship with QED. There is testimony, however, which shows that Stanley was responsible for recruiting clients for QED, through whatever means were available to him. Stanley's activities in failing to remove the defamatory postings and websites about Rip-off Report, as well as in creating new defamatory postings about Rip-off Report, were both done for the purpose of directing clients to QED. The principle of respondeat superior therefore governs the liability of QED, and QED must be held in contempt for these actions.

9

Similarly, QED must also be held liable for contempt because it aided and abetted Stanley's violation of the Preliminary Injunction. Subsection (d) of Rule 65, defining scope of an injunction or restraining order, is derived from the common-law doctrine that a decree of injunction not only limits the parties defendant but also those identified with them in interest, in privity with them, represented by them or subject to their control, so that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, though they were not parties to original proceeding. *Regal Knitwear Co. v. N.L.R.B.*, 65 S.Ct. 478, 324 U.S. 9, 89 L.Ed. 661 (1945); *see also* Fed.R.Civ.P. Rule 65(d). This is, of course, exactly what happened in this case.

QED should therefore be held liable for contempt both because it abetted Stanley and because it is legally identified with Stanley; it may also be held liable for contempt because it was in active concert or participation with Stanley. *See N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628 (9th Cir. 1977); *see also Reich v. U.S.*, 239 F.2d 134 (1st Cir. (Me.) 1956), certiorari denied 77 S.Ct. 563, 352 U.S. 1004, 1 L.Ed.2d 549 (One who knowingly aids, abets, assists, or acts in active concert with a person who has been enjoined, in violating an injunction, subjects himself to civil as well as criminal proceedings for contempt).

## V. **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that this Court enter an Order finding Defendant QED Media Group, LLC in contempt for its violation of the Preliminary Injunction issued by this Court on June 21, 2007.

DATED this 9th day of November, 2007.

**JABURG & WILK, P.C.**

/Laura Rogal/
Kraig J. Marton
Maria Crimi Speth
Adam S. Kunz
Laura Rogal
Attorneys for Plaintiffs

10

**Certificate of Service**

I hereby certify that on November 9, 2007, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Teresa Kay Anderson
Snell & Wilmer LLP
One Arizona Center
400 E Van Buren
Phoenix, AZ 85004

Michael Kent Dana
Snell & Wilmer LLP
400 E Van Buren
Phoenix, AZ 85004-0001

With a COPY of the foregoing emailed on the 9th day of November, 2007, to:

William "Bill" Stanley
videowebsites@yahoo.com
jorybernhard@yahoo.com

With a COPY of the foregoing hand-delivered on the 9th day of November, 2007, to:

Honorable Neil V Wake
United States District Court
District of Arizona

/s/ Debra Gower

11

10297-14/LAR/DSG/620729_v2